## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 15 |
| VBI Vaccines (Delaware) Inc., *et al.*,[1] | Case No. 24-11623 (        ) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**DECLARATION OF JEFFREY BAXTER IN SUPPORT OF (I) CHAPTER 15
PETITIONS FOR RECOGNITION OF FOREIGN PROCEEDING AND
(II) MOTION OF THE FOREIGN REPRESENTATIVE FOR ENTRY OF
PROVISIONAL AND FINAL ORDERS GRANTING RECOGNITION OF
FOREIGN PROCEEDING AND CERTAIN RELATED RELIEF UNDER
SECTIONS 105(a), 362, 365, 1517, 1519, 1520 AND 1521
<u>OF THE BANKRUPTCY CODE</u>**

I, Jeffrey Baxter, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the law of the United States, as follows:

1.      I am the current President and Chief Executive Officer ("<u>CEO</u>") of VBI Vaccines Inc. ("<u>VBI</u>"). I was appointed CEO of VBI in May 2016, and in this capacity, have oversight and overview of VBI's wholly owned subsidiaries, all of whom are described in more detail below (collectively with VBI, the "<u>VBI Group</u>" or the "<u>CCAA Debtors</u>"). As such, I have been responsible for the overall direction and leadership of VBI Group and I have personal knowledge of the facts outlined herein. If called to testify as a witness, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. Where I have relied on other sources of information, I have so stated and believe them to be true and accurate.

---

[1]  The Debtors and the last four digits of its U.S. Federal Employer Identification Numbers or other unique identifier are as follows: VBI Vaccines Inc. (4170) (British Columbia Corporation No.), VBI Vaccines (Delaware) Inc. (9534), Variation Biotechnologies (US) Inc. (6196), and VBI Vaccines B.V. (1726) (Netherlands Corporation No.).  The Debtors' mailing address is 160 Second Street, Floor 3, Cambridge, MA 02142.

2.      I respectfully submit this declaration in support of (i) the chapter 15 petitions filed by VBI Vaccines (Delaware) Inc. ("VBI Delaware"), which is the duly appointed foreign representative (the "Foreign Representative"), VBI Vaccines Inc. ("VBI"), Variation Biotechnologies (US) Inc. ("VBI US"), and VBI Vaccines B.V. ("VBI BV," and collectively with VBI Delaware, VBI, and VBI US, the "Chapter 15 Debtors") seeking recognition of the Canadian proceeding (the "Canadian Proceeding") commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") by the Bankruptcy Court as a foreign main proceeding under section 1515 of title 11 of the United States Code (the "Bankruptcy Code"), and (ii) the *Motion of the Foreign Representative for Entry of Provisional and Final Orders Granting Recognition of Foreign Proceeding and Certain Related Relief Under Sections 105(a), 362, 365, 1517, 1519, 1520 and 1521 of the Bankruptcy Code* (the "Recognition Motion").

**I.      Background of the VBI Group and Their Operations**

3.      VBI, a company incorporated under the British Columbia Business Corporations Act, SBC 2002, c 57 ("BCBCA") with a registered office in Vancouver, British Columbia, is a biopharmaceutical company. VBI, along with and through its subsidiaries, has research operations in Ottawa, Canada, an office in Cambridge, Massachusetts, where certain of VBI's officers are located, and a research and manufacturing site in Rehovot, Israel.   Variation Biotechnologies Inc. ("VBI Cda"), a Canadian subsidiary of VBI, manages the research operations in Ottawa, where notably the human resource, treasury, cash management and accounting functions of VBI and the other Chapter 15 Debtors are located.

4.      VBI is driven by immunology in the pursuit of prevention and treatment of disease. Through its innovative approach to virus-like particles, VBI develops vaccine candidates that mimic the natural presentation of viruses, designed to elicit the innate power of the human immune

system.    VBI's vaccines target significant infectious diseases, such as hepatitis B, COVID-19, Zika, coronaviruses, and cytomegalovirus, as well as aggressive cancers including glioblastoma ("GBM").

5.    VBI's product pipeline includes an approved vaccine for the prevention of the Hepatitis B Virus ("HBV") – brand names for which include: PreHevbrio (US, Canada), PreHevbri (Europe), and Sci-B-Vac (Israel) ("PreHevbrio") – and multiple late and early-stage investigational programs.    The investigational programs are in various stages of clinical development.    None of these investigational programs have been approved by the relevant health agencies worldwide.    PreHevbrio is therefore VBI's only commercialized product to date.

6.    VBI's income generating activities include the sale of PreHevbio in the United States, PreHevbri in certain European countries, and Sci-B-Vac in Israel, fees from research and development services, and revenue from partnership collaborations.    VBI's long-term success is dependent on achieving and sustaining commercial success of PreHevbrio in Canada, the United States, Europe, and other additional global markets where it has or may obtain marketing authorization, as well as successful clinical development, regulatory approval, and commercialization of its pipeline candidates, which will require significant time and resources.

7.    However, due to, among other things, the complexity of the vaccine administration and healthcare environment, intense competition, rapid technological change in the pharmaceutical market, the substantial expense and amount of time required for pre-clinical testing and clinical trials, and the volatile global economy which can affect the amount of capital available to be deployed in investments in biotechnology, including the VBI Group's business, the VBI Group has a history of operating losses and are experiencing significant cash flow issues that will continue to jeopardize their ability to pursue their strategic plans and product plans.

8.      As of March 31, 2024, VBI had an accumulated deficit of $600,345,000 and cash of $12,595,000, with losses continuing to accrue.   The VBI Group expects to incur significant operating losses going forward as they support the continued commercialization activities of PreHevbrio, advance other pipeline candidates into and through clinical development, complete clinical trials, and seek regulatory approval.   If the VBI Group is unable to obtain additional financing on acceptable terms, they will likely have to curtail or cease their development plans and operations, to the detriment of their multiple stakeholders, including employees.

9.      To address these issues, as further described in this declaration, in October 2023, the VBI Group commenced a formal strategic review process to explore, review, and evaluate a broad range of strategic alternatives focused on ensuring their financial liquidity, including but not limited to, possible debt or equity financing, asset sale, merger and acquisition, or licensing transactions (the "Pre-Filing Strategic Process").   While VBI is constantly engaged in strategic discussions with potential partners to identify opportunities to increase and realize value of its pipeline programs, as part of a formal initiative, in the second half of 2023, the VBI Group engaged Province Firm ("Province"), a nationally recognized restructuring and financial advisory firm in the United States and abroad, to market, through a formal sale process, all portfolio assets (the "2023 Sale Process").   Despite extensive efforts, no viable proposal with suitable economic terms was received.

10.      In parallel to the 2023 Sale Process, the VBI Group also pursued three additional processes, with the goal of (i) repaying some or all of the current debt owing to VBI's secured lender, given that the VBI Group was in a forbearance period after realizing an event of default, and (ii) extending the VBI Group's cash runway to be able to continue operations.

11.     The first process consisted of two separate financing efforts with banking partners to raise funds through the issuance of new shares.   These efforts were ultimately unsuccessful due to the funds required to continue near-term operations compared to the current market capitalization of the VBI Group, as well as the difficult macro environment for financing public biotechnology companies.

12.     The second process consisted of negotiations with two strategic counterparties, with whom discussions dated back prior to the 2023 Sale Process.   Ultimately, two preclinical collaboration proposals were received which provided for no consideration to be paid upfront. One of these collaborations is ongoing and the other is still being evaluated for viability.

13.     The third process consisted of negotiations with Brii Biosciences ("Brii Bio") to expand the current partnership, such that on February 14, 2024, VBI announced an agreement with Brii Bio whereby VBI Group would receive up to USD$33 million, subject to the achievement of certain milestones, in exchange for: (i) its manufacturing capabilities and certain related assets at the Israel manufacturing facility, (ii) intellectual property for VBI's immunotherapeutic HBV candidate and the paydown of financial obligations tied to the licensing deals in July 2023, and (iii) an exclusive Asia Pacific (APAC) license (which excludes Japan) to develop and commercialize VBI's GBM immunotherapeutic candidate.

14.     While the VBI Group continues to work on achieving the above-mentioned activities and milestones, it has become clear that they will run out of liquidity shortly, and prior to the closing of the transactions with Brii Brio, which has become increasingly uncertain.   As such, the VBI Group had no choice but to continue their ongoing operations, including the completion of these activities, with the protection granted through the CCAA.   The purpose of the CCAA filing is to ensure that the VBI Group is able to maintain their operations, obtain the

necessary runway and as required, financial support, in order to conduct a court-supervised sale and investment solicitation process (the "SISP") and preserve value for such sale process for the remaining assets.   The VBI Group is also currently working with their advisors to develop a Key Employee Retention Plan ("KERP"), since there are certain key employees that are essential to not only the restructuring, but the core value of the VBI Group, and the VBI Group will be unable to maintain their operations and finalize any of its manufacturing and clinical milestones without said employees.   The VBI Group intends to seek the Canadian Court's approval of the KERP in due course and likely in the context of the Comeback Hearing (as defined below).

II.    **The VBI Group's Corporate Structure**

15.    VBI was incorporated under the BCBCA on April 9, 1965, and has its registered office at Suite 1700, Park Place, 666 Burrard Street, Vancouver, British Columbia.   In addition to R&D operations and administrative functions in Ottawa, Canada, and manufacturing operations in Rehovot, Israel, VBI also has an office located in Cambridge, Massachusetts, United States.

16.    In May 2016, VBI started trading publicly and its common stock is listed on the NASDAQ Market under the symbol "VBIV."

17.    VBI wholly-owns or indirectly owns a number of subsidiaries incorporated in Delaware (United States), Ottawa (Canada), Israel, Hong Kong, and the Netherlands, as appears from its organizational chart, reproduced below:

# Corporate Structure - Overview



18.    VBI Delaware was originally established in 1970 as Paulson Capital Corp., an Oregon corporation ("Paulson Oregon"), which began as a holding company whose operating subsidiary, Paulson Investment Company, Inc., was a full-service brokerage firm.    Effective March 20, 2014, Paulson Oregon changed its state of incorporation from the State of Oregon to the State of Delaware, and as a result, Paulson Oregon became "Paulson Capital (Delaware) Corp." and Paulson Oregon ceased to exist.    On July 25, 2014, VBI US completed its merger with VBI Acquisition Corp. ("Merger Sub"), a Delaware corporation and wholly-owned subsidiary of Paulson Capital (Delaware) Corp., whereby Merger Sub merged with and into VBI US, with VBI US continuing as the surviving corporation.    As a result of this merger, VBI US was acquired by, and became a wholly owned subsidiary of Paulson Capital (Delaware) Corp. Paulson Capital (Delaware) Corp. changed its name on several occasion, adopting its current name of VBI Vaccines (Delaware) Inc. (*i.e.*, VBI Delaware) on July 19, 2016.

19.    VBI US, a Delaware corporation, is a wholly owned subsidiary of VBI Delaware. VBI US is a shell entity which no longer operates as the result of various corporate transactions.

20.    VBI Cda is a wholly owned subsidiary of VBI US.    VBI Cda was incorporated on August 24, 2001, under the Canada Business Corporations Act, RSC 1985, c C-44.    VBI Cda is

located and has its registered office in Ottawa, Ontario, and is the entity that manages all of VBI's research operations and facility located in Ottawa.   The Canadian research site benefits from its location in Canada's National Capital Region, providing VBI with access to world-class research facilities.   VBI Cda's active research collaboration with the Canadian federal government's National Research Council ("NRC") provides its staff with on-site access to the NRC's animal facility for greater control over the testing of VBI's pipeline candidates.

21.     VBI BV is a wholly owned subsidiary of VBI, and was incorporated on October 21, 2020 in the Netherlands.   VBI BV is the entity authorized to distribute, sell, and commercialize (the "Marketing Authorisation Holder") PreHevbri in Europe. VBI BV has one bank account at Silicon Valley Bank in the United States.

22.     SciVac Ltd. ("SciVac"), located in Rehovot, Israel, is a wholly owned subsidiary of VBI that was incorporated on April 18, 2005 pursuant to the Israeli Companies Law (1999), as amended.

23.     SciVac Hong Kong Limited ("SciVac HK") is a wholly owned subsidiary of VBI and was incorporated pursuant to the Companies Ordinance (Chapter 622 of the Laws of Hong Kong) on January 29, 2019.

24.     VBI and each of its subsidiaries operate as one corporate group, and are financially dependent upon VBI as VBI funds their respective cash flow requirements. As of the date of this filing, based on discussions with VBI Group's legal advisors, we believe that only VBI, VBI Delaware, VBI US, and VBI BV require protection under Chapter 15, but all rights are reserved to include any other VBI subsidiary in subsequent filings, if necessary. Additionally, insolvency proceedings or proceedings to recognize the Canadian Proceeding may need to be filed in additional jurisdictions, but as of the date of this declaration no such proceedings have been filed.

III.     **The VBI Group's Capital Structure**

A.     *The K2HV Loan Agreement*

25.     VBI BC and VBI Cda, as borrowers, and SciVac, VBI Delaware and VBI US, as guarantors, entered into that certain Loan Agreement, as amended by that first amendment, dated as of May 17, 2021, that second amendment, dated as of September 14, 2022, that third amendment, dated as of July 5, 2023, and the Fourth Amendment dated as of February 13, 2024, (collectively, the "K2HV Loan Agreement"), with K2 HealthVentures LLC ("K2HV") and any other lenders party thereto from time to time (collectively, the "Loan Parties").

26.     The obligations under the K2HV Loan Agreement are secured on a senior basis by a lien on substantially all of the assets of VBI and its subsidiaries, including the bank account of VBI BV, except for SciVac HK and VBI BV non-cash assets and liabilities.   SciVac, VBI Delaware and VBI US are guarantors of the obligations of VBI and VBI Cda under the K2HV Loan Agreement.   The K2HV Loan Agreement also contains customary events of default.

27.     On February 13, 2024, the Loan Parties entered into an amendment, i.e., the Fourth Amendment, effective upon entry into certain transactions with Brii Bio, pursuant to which the parties have agreed to, among other things, (i) remove a financial covenant requiring VBI to maintain minimum net revenue of 75% of projections, (ii) the forbearance by K2HV and the other lenders party thereto, prior to the earlier of (A) December 31, 2024, (B) the date the Side Letter ceases to be in full force and effect prior to the completion of the Essential Activities and (C) the date the Essential Activities are complete (the "Forbearance Expiration Date") from exercising their remedies with respect to the occurrence of Events of Default (as defined in the K2HV Loan Agreement) subject to certain exceptions, and (iii) following the Forbearance Expiration Date, add a financial covenant requiring VBI to maintain a minimum cash amount equal to its obligations under the Loan Agreement at all times.

28.     The effectiveness of the Fourth Amendment was conditioned upon entry into certain agreements with Brii Bio, each of which were entered into by VBI and the respective parties thereto on February 13, 2024.

29.     The principal amount of the K2HV term loan as of December 31, 2023, was $50 million ($55.7 million including the exit fees).   During the year ended December 31, 2023, VBI and VBI Cda made average monthly payments of interest in the amount of approximately $515,000.   VBI and VBI Cda are required to pay interest only until maturity on September 14, 2026.

30.     As of December 31, 2023, VBI was required under applicable accounting rules to reclassify the outstanding principal amount of the K2HV Loan Agreement, as amended, as a current liability rather than a long-term liability due to the failure to meet a minimum net revenue covenant for the measurement period ended December 31, 2023, pursuant to a forbearance agreement entered into between the Loan Parties on November 13, 2023.   The reclassification of the indebtedness as a current liability has resulted in negative net working capital as of December 31, 2023.

31.     On May 9, 2024, VBI and VBI CDA, together with K2HV, entered into an agreement regarding severance and related payments (the "Severance Plan Agreement") whereby VBI Cda was authorized, pursuant to the terms and conditions provided therein, to proceed with certain severance payments to be made in connection with the anticipated termination of certain employees.   In accordance with that Severance Plan Agreement, VBI Cda terminated 10 employees on April 18, 2024.

### B.     The Brii Bio Security Interest

32.     In connection with certain transactions with Brii Bio described above, VBI, VBI Cda, SciVac, and Brii Bio granted to Brii Bio a security interest, subject to a subordination

agreement (the "Subordination Agreement") between Brii Bio and K2HV, in all of their respective right, title, and interest in and to all intellectual property, know-how, and licenses to the extent related to PreHevbri and VBI-2601, and all proceeds of the foregoing, in order to secure performance of all of VBI's obligations under certain agreements with Brii Bio and the K2HV Loan Agreement.

### C.    *Unsecured Debt*

33.    As of the filing of the Canadian Proceeding, the CCAA Debtors owed outstanding obligations to their employees and accounts payable of over USD $9,000,000.

## IV.    Canadian Proceeding

34.    On July 30, 2024, the Canadian Court entered an initial order (the "Initial Order") and endorsement (the "Endorsement") in the Canadian Proceeding, which are attached to the Recognition Motion as Exhibit A.    The Initial Order states that "for the purposes of any applications authorized by paragraphs 50 and 51 [referring to proceedings outside of Canada], the Applicants' centre of main interest is located in the province of Ontario, Canada." Initial Order at 52.    The Endorsement similarly affirms this finding, stating that: "Given the cross border nature of the Applicants' operations, the fact that the research, management, decision making, cash management, human resources and other activities take place in Ontario further reinforces the conclusion that the COMI of the VBI Group is Ontario." Endorsement at 10.

35.    The Initial Order provides for certain relief detailed below, which the CCAA Debtors will seek to finalize through entry of an amended and restated Initial Order (the "ARIO") at a hearing (the "Comeback Hearing") scheduled for August 9, 2024 at 8:30 am ET.    Through the Canadian Proceeding, the VBI Group seeks various forms of relief, including the following:

### A.   Stay of Proceedings

36.     The VBI Group is insolvent and urgently requires a broad stay of proceedings and other protections provided by the CCAA in order to preserve the status quo and secure breathing space to prevent the exercise of remedies by contractual counterparties and others.    Additionally, the stay of proceedings will provide the VBI Group the necessary time to fully canvass several restructuring options, including the negotiation with various stakeholders in order to minimize ongoing operational losses.    The Initial Order includes certain "Stay Period" provisions in paragraphs 13 through 18 providing a stay of proceedings for an initial period of ten days (the "Initial Stay Period").

### B.   Appointment of Monitor

37.     Pursuant to the Initial Order, Ernst & Young Inc. ("EY") will act as monitor (in such capacity, the "Monitor") in respect of the CCAA Debtors in the Canadian Proceeding.    I am advised by Mr. Martin Rosenthal of EY that EY is a "trustee" within the meaning of section 2 of the *Bankruptcy and Insolvency Act* (as amended) and is not subject to any of the restrictions on who may be appointed as monitor set out in section 11.7(2) of the CCAA.    I understand that EY has extensive experience acting as monitor or financial advisor to debtor companies under the CCAA and has consented to act as the Monitor of the CCAA Debtors under the CCAA.

38.     I am advised by Mr. Martin Rosenthal of EY that the Monitor is supportive of the relief being sought by the Chapter 15 Debtors in these cases (the "Chapter 15 Cases") and has filed a pre-filing report with the Canadian Court in conjunction with the relief requested under the CCAA by the CCAA Debtors in the Canadian Proceeding.

### C.   Cash Flow Forecast

39.     The CCAA Debtors in the Canadian Proceeding have prepared 13-week cash flow projections and the underlying assumptions as required by the CCAA.    A copy of the cash flow

projections is attached hereto as **Exhibit A**.    The projections demonstrate that the CCAA Debtors require access to additional funding during the Canadian Proceeding.    The CCAA Debtors' principal use of cash during the Canadian Proceeding will be the costs associated with the ongoing operation of the CCAA Debtors' business including, among other things, employee compensation, supplier payments, lease payments and general administrative expenses.    In addition to these normal course operating expenditures, the CCAA Debtors will also incur professional fees and disbursements during the Canadian Proceeding and these Chapter 15 Cases.

### D.    DIP Financing

40.    On July 29, 2024, VBI, VBI Cda, VBI Delaware, VBI US and SciVac, as borrowers (in such capacity, the "Borrowers"), and each Borrower, SciVac HK and VBI BV, as guarantors (in such capacity, the "Guarantors"), and K2HV, in its capacity as DIP lender (the "DIP Lender"), entered into a debtor-in-possession facility term sheet (the "DIP Facility Agreement").    The DIP Facility Agreement provides for a super-priority, interim, non-revolving credit facility up to a maximum principal amount of USD$2,500,000 (the "DIP Facility").    The interest rate applicable to advances under the DIP Facility is 17.5% per annum, calculated daily and compounded monthly and payable on the Maturity Date (as defined below).

41.    The DIP Facility is subject to customary covenants, conditions precedent, and representations and warranties made by the Borrowers to DIP Lender. Per the DIP Facility Agreement, the DIP Loan must be repaid in full by the date (the "Maturity Date") that is the earliest of:

      a.  September 6, 2024 (or such later date as the DIP Lender in its sole discretion may agree to in writing with the Borrowers and the Guarantors);

      b.  the date on which (i) the stay of proceedings under the Canadian Proceeding is lifted without the prior written consent of the DIP Lender, or (ii) the Canadian Proceeding is terminated;

    c.  the date of closing of a sale or similar transaction (including pursuant to a reverse vesting purchase agreement) (a "<u>Sale Transaction</u>") for all or substantially all of the assets and business, or in respect, of the Borrowers and the Guarantors pursuant to the SISP;

    d.  the date of implementation of a plan of compromise or arrangement within the Canadian Proceeding which has been approved by the requisite majorities of the Borrowers' and the Guarantors' creditors and sanctioned by an order entered by the Canadian Court;

    e.  the conversion of the Canadian Proceeding into one or more proceedings under the *Bankruptcy and Insolvency Act* (Canada); or

    f.  the date on which an Event of Default (as defined in the DIP Facility Agreement) occurs and is continuing, in respect of which the DIP Lender has elected in its sole discretion to accelerate all amounts owing hereunder and demand repayment.

42.    In accordance with the DIP Facility Agreement, the DIP Facility is to be used during these Canadian Proceeding for the following purposes:

    a.  to fund working capital and general corporate needs of the Borrowers during, and costs and expenses incurred by the Borrowers in connection with, the Canadian Proceeding; and

    b.  to pay other general corporate expenses and operating costs of the Borrowers, including the Borrowers' expenses and operating costs in the CCAA proceedings pursuant to Cash Flow Projections (as defined in the DIP Facility Agreement and as agreed to by the DIP Lender.

43.    Based on the CCAA Debtors' cash flow forecast, I believe that the DIP Facility is expected to provide the CCAA Debtors with sufficient liquidity to continue their business operations during the Canadian Proceeding while completing a restructuring for the benefit of the CCAA Debtors and their stakeholders.

44.    Pursuant to the Initial Order, the CCAA Debtors obtained authority from the Canadian Court to draw up to a maximum amount of USD$150,000 under the DIP Facility Agreement within the Initial Stay Period.

### E.   The Charges

#### 1.   Administration Charge

45.   The Initial Order provides for a Court-ordered charge in favor of the Monitor, the Monitor's counsel, and the CCAA Debtors' counsel over all of the CCAA Debtors' property in order to secure payment of their respective fees and disbursements incurred in connection with services rendered in respect of the CCAA Debtors up to a maximum amount of USD$400,000 (the "Administration Charge").   The amount of the Administration Charge is proposed to be increased to USD$600,000 at the Comeback Hearing.   The Administration Charge is proposed to rank ahead of and have priority over all of the other charges and security.

#### 2.   Directors' Charge

46.   A successful restructuring of the CCAA Debtors will only be possible with the continued support, insight, and participation of the CCAA Debtors' directors and officers (the "Directors and Officers") and together with the Administration Charge and the DIP Lender's Charge, the "Charges").   These personnel are essential to the viability of the CCAA Debtors' continuing business and the preservation of enterprise value and they have advised that they will remain in order to assist with the upcoming restructuring.

47.   I am advised by the CCAA Debtors' legal counsel and believe that, in certain circumstances, directors can be held liable for certain obligations of a company, including those owing to employees and government entities, which may include unpaid accrued wages, unpaid accrued vacation pay, unremitted source deductions, health taxes, workers' compensation and other payroll related obligations.

48.   It is my understanding that the Directors and Officers are insureds under director and officer liability insurance (the "D&O Policy") maintained by VBI.   However, I understand

that the D&O Policy may include contractual contingencies, exclusions, and/or uncertainty associated with possible coverage related issues.

49.     Although the CCAA Debtors intend to comply with applicable laws with respect to matters affecting it, the failure to complete a restructuring creates the prospect of personal liabilities for the Directors and Officers.   I do not believe that the D&O Policy provides sufficient coverage against the potential liability that the Directors and Officers could incur in relation to the Canadian Proceeding and these Chapter 15 Cases.

50.     In light of the complexity and scope of the overall enterprise and potential liabilities and the uncertainty surrounding available indemnities and insurance, the Directors and Officers indicated to the CCAA Debtors that their continued service and involvement in the Canadian Proceeding and Chapter 15 Cases was conditional upon the granting of an order under the CCAA which grants a charge in favor of the Directors and Officers (the "Directors' Charge").   The Initial Order provided for the Directors' Charge in the initial amount of USD$200,000, which will rank subordinate to the Administration Charge.   The amount of the Directors' Charge is proposed to be increased to USD$300,000 at the Comeback Hearing. Notably, the proposed Initial Order provides that the Directors and Officers will only have recourse to the Directors' Charge as a "back-stop" in the event that the D&O Policy (which I believe covers most typical director and officer liabilities) is not available or applicable.

### 3.     DIP Facility and DIP Lender's Charge

51.     The DIP Facility Agreement provides, among other things, that the DIP Facility is contingent on the granting of a priority charge over certain of the CCAA Debtors' property in favor of the DIP Lender (the "DIP Lender's Charge").   The DIP Lender's Charge will secure all of the credit advanced under the DIP Loan.   The DIP Lender's Charge will not secure obligations incurred prior to the Canadian Proceeding.   The Initial Order provided for the DIP Lender's

Charge in the initial amount of USD$300,000, which will rank subordinate to the Administration and Directors' Charges.    The amount of the DIP Lender's Charge is proposed to be increased to USD$2,850,000 at the Comeback Hearing.

## V.    The Chapter 15 Cases

52.      On the date hereof, the Foreign Representative commenced these Chapter 15 Cases by filing petitions for relief under chapter 15 of the Bankruptcy Code.    Contemporaneously herewith, the Foreign Representative filed, among other things: the (i) *Motion of Foreign Representative for Joint Administration of Chapter 15 Cases and Granting Related Relief* (the "Joint Administration Motion"); (ii) Recognition Motion; and (iii) *Motion of the Foreign Representative for Entry of an Order (I) Specifying Form and Manner of Service of the Recognition Hearing Notice Under Sections 105(a), 1514 and 1515 of the Bankruptcy Code and Bankruptcy Rules 2002 and 9007, (II) Scheduling Hearing, and (III) Granting Related Relief* (the "Notice Procedures Motion").

### A.      *The Joint Administration Motion*

53.      Based on my understanding of what is required for joint administration, I believe that joint administration is warranted in these cases. The Chapter 15 Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties.

54.      I understand that the Foreign Representative anticipates that the various notices, applications, motions, other pleadings, hearings and orders in these Chapter 15 Cases will affect each of the Chapter 15 Debtors.   The failure to administer these cases jointly would result in duplicative pleadings and service.   Such unnecessary duplication would impose avoidable expenses on all interested parties.

55.     Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Chapter 15 Debtors, their creditors, and other parties in interest.

**B.     *The Recognition Motion***

56.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business, or "nerve center."   I believe that the Canadian Proceeding meets this requirement.   Ultimately, the Chapter 15 Debtors are largely run by the British Columbia incorporated, and Ottawa based parent, VBI.   I believe the Chapter 15 Debtors' center of main interest is Ontario, Canada because, among other things:

a.   VBI, one of the Chapter 15 Debtors, and the parent company to the other three (3) entities that comprise the remaining Chapter 15 Debtors, is a company incorporated under the British Columbia Business Corporations Act, SBC 2002, c 57 with its registered office in Vancouver, British Columbia.

b.   VBI has all of its research operations and a research facility in Ottawa, Ontario managed by VBI Cda, a Canadian subsidiary of VBI which has its registered office in Ottawa, Ontario.

c.   All of the VBI Group's finance team, with the exception of the Chief Financial Officer, is located in Ottawa, Ontario.

d.   Certain of the VBI Group's corporate, strategic and management functions are located in Ottawa, Ontario.

e.   Human resource, treasury (including accounts receivable and accounts payable), and accounting functions of the Chapter 15 Debtors are located in Ottawa.

f.   Approximately two-thirds (or approximately 20 out of 30) of the VBI Group's North American employees are located in Canada.

g.   The Chapter 15 Debtors' banking and cash management systems are also tied to Canada.   VBI has three (3) bank accounts with Banque of Montreal. VBI

18

receives all proceeds from share capital issuances and loan proceeds and funds the expenditures of VBI Delaware, VBI US, and VBI BV from its accounts.

h.   The two Canadian registered entities of the VBI Group are the borrowers under the K2HV Loan Agreement, with the remaining VBI Group entities being only guarantors.

i.   The counterparty to the D&O Policy is VBI, with the insurer being a Canadian entity, the choice of law being Canada, and VBI's subsidiaries covered as subsidiaries.

j.   The transaction with Brii Bio is pursuant to an agreement in which VBI is the counterparty.

k.   Canada is the readily ascertainable jurisdiction of the majority of the VBI Group's creditors, considering, among other things, that the VBI Group's Canadian entities are the borrowers under the K2HV Loan Agreement, and that a substantial amount of other unsecured claims, such as the Chapter 15 Debtors' accounts payable, are owed to Canadian creditors.

57.   In addition to seeking recognition on a final basis, the Foreign Representative also requests certain provisional relief.   Pending recognition of the Canadian Proceeding, the Foreign Representative seeks provisional relief to enjoin collection efforts against the Chapter 15 Debtors and their assets, as well as to protect potentially valuable contractual relationships.   This relief is necessary to avoid immediate and irreparable harm to the Chapter 15 Debtors and their assets if U.S. creditors and contract counterparties begin a "race to the courthouse" or resort to other self-help remedies.   The Chapter 15 Debtors will not have the resources to restructure and will not be able to maintain orderly bankruptcy process if they are forced to deal with creditors and litigation in the United States in individual state courts.

58.   This provisional relief is consistent with the Initial Order, which, among other things, stays all creditor collection actions against the CCAA Debtors and their assets and prohibits contract counterparties from terminating contracts with the CCAA Debtors.

59.     For the foregoing reasons, I believe that the relief sought in the Recognition Motion, including immediate provisional relief, is necessary and appropriate and is in the best interests of the Chapter 15 Debtors, their creditors, and other parties in interest.

### C.      The Notice Procedures Motion

60.     The Chapter 15 Debtors have hundreds of potential creditors and other parties-in-interest, all of whom need to be provided with, among other things, notice of the provisional order, the proposed final order, the recognition objection deadline, and the recognition hearing.   The Foreign Representative has prepared a form of notice advising of these and related matters (the "Recognition Hearing Notice"), a copy of which is annexed to the Notice Procedures Motion.

61.     Under the facts and circumstances of these Chapter 15 Cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

62.     Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Chapter 15 Debtors, their creditors, and other parties in interest.

## VI.      Relief to be Sought at the Comeback Hearing

63.     The CCAA Debtors will request entry of the ARIO at the Comeback Hearing in the Canadian Proceeding. The ARIO will, among other things:

    a.   request to extend the Stay of Proceedings (as defined in the Initial Order);

    b.   request to increase the amounts which may be borrowed by the Applicants under the DIP Financing Agreement to USD$2,500,000, which, together with the other obligations of the Applicants under the DIP Financing Agreement will be secured by the DIP Lenders' Charge;

    c.   request approval of the KERP;

    d.   request approval of the SISP;

    e.   request authorization for VBI to dispense with certain securities filing requirements, incur no further expenses in relation to any filings (including financial statements), disclosures, core or non-core documents, restatements, amendments to existing filings, press releases or any other actions (collectively, the "Securities Filings") that may be required by any federal, state, provincial or other law respecting securities or capital markets in the United States or Canada, or by the rules and regulations of a stock exchange, including without limitation, the rules and regulations of the Securities and Exchange Commission and the NASDAQ Stock Market LLC Rules or other rules, regulations and policies of the NASDAQ, and declare that none of the directors, officers, employees, and other representatives of the CCAA Debtors, or the Monitor (and its directors, officers, employees and representatives) shall have any personal liability for any failure by the CCAA Debtors to make Securities Filings;

    f.   request to increase the amounts of the Charges; and

    g.   seek such other relief as may be required to advance the Applicants' restructuring.

**VII.**   **Conclusion**

64.    The CCAA Debtors have determined that it is in their best interests and those of their stakeholders to commence the Canadian Proceeding and these Chapter 15 Cases.   Without the relief requested, including the stay of proceedings and access to the DIP Facility, the CCAA Debtors face an immediate cessation of going concern operations, the liquidation of its assets, and the loss of its employees' jobs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 30, 2024

                                 */s/ Jeffrey Baxter*

                                 Name: Jeffrey Baxter

                                 Title: President and CEO of VBI Vaccines Inc.